Mr. Powell and Mr. Froude. Good morning. Yes, good morning, Your Honor. Good morning, Your Honor. Together with Judge Hickinson and Judge Wood, we are here to hear your arguments in this case, J. Weber v. BNSF Railway Company. We'll start with Mr. Powell. Good morning, Your Honors, and may it please the Court. My name is Greg Powell, and I represent the appellant plaintiff below, J. Weber. I represent what's before the Court are two failure-to-accommodate cases under what broadly would be referred to as disability discrimination statutes, including the Americans with Disabilities Act, the Rehabilitation Act, and the Texas Commission on Human Rights Act. There is one accommodation case that occurred or failure to accommodate case that occurred in 2015 and another that occurred in 2016. Because the 2016 accommodate resulted in his termination, unless the Court prefers otherwise, I would start my argument there. Mr. Weber worked for many years. He started in I believe 1981 with BNSF Railway, primarily as a train dispatcher. So that's an inside job governing the movement of trains. He also served as a union representative at various times throughout his railroad that was actually a separately paid job. But the events that bring us here today are that Mr. Weber had a seizure on April 15th of 2015 that resulted in seeing a neurologist in medical care and pursuant to the doctor's advice and company policy, was withheld from service for 90 days. And he had an excessive absenteeism problem prior to the seizure. Prior to that April 15 seizure, I would say that because his role as a union representative, which was paid separately, he was required to miss a lot of work. And of course, a lot of that predates well, I don't know that that matters, but predates the ADA and other discrimination laws. But yes, he did have absences. And ultimately, I think where I'd like to end up with this argument is the issue is what is an excused absence. And I would submit that it is true that Mr. Weber had absences. He was granted what's called managerial leniency in part because his union duties required him not to work in his train dispatcher capacity. I hope that answers your question. But to the extent that there were a vast number of unexcused absences, I would not agree that there was a excessive absenteeism. And it's true. And I think the district court was persuaded and certainly BNSF has made that argument that he has a abysmal record when it comes to attendance. But what's relevant are the five absences that resulted in his discipline and termination that occurred in 2015. And I would submit those are the absences. Four of the five were directly related to his seizure. Two were doctor's visits with his neurologist. And two were times when he did not feel he could work because of a lack of sleep that he felt that he would not have been safe to work those two days. The fifth day, for what it's worth, was for a colonoscopy. So a medical procedure, but not one we would submit as related to the disability. So we're focusing on the four absences. And if it's helpful to be specific, I can. The two neurologist appointments, one was on January 29th of 2016, and the second was on March 4th of 2016. And those are at the record 965 through 977. The triggering events, and maybe I should just hop right into that, were January 20th of 2016 and February 9th of 2016. And I think the railroad makes much of this concept that it's unlimited leave. And I would be the first one to agree that reasonable accommodation, although it hinges on undue hardship, it can never be indefinite or unextended. But the ADA itself and the interactive process envisions communication going back and forth. So Mr. Weber was very specific about asking his supervisors for permission for the doctor's appointments. And those, of course, are foreseeable scheduled events. He was required to see the neurologist twice a year. So the record is clear that as to the four that we're talking about, he asked in advance and was given approval or he asked. Oh, sorry, your honor. No, that's my question. Yes. Two for the office visits with his neurologists. He asked for permission from his supervisor, Sterling Barker, and was given it or not. In one event, there was an email where Mr. Barker said, OK. And so Mr. Weber understood that to be an approval with respect to the other two. Those were not requested in advance because they're unforeseeable. I mean, he did not know, you know, in advance that he was not going to get enough sleep such that he felt that he was at risk based on his neurologist. And it's undisputed he didn't have medical leave for these. He'd exhausted it. If I remember, he was going to begin to have it again by April. So is it relevant to your legal position or BNSF that the record may or may not show that he refused to use his personal and vacation time because he just had to bridge a little bit of time and he'd been warned that, OK, we have new management and we just can't be as flexible, lenient as we've been in the past. So as I so it's to me not like a Carmona situation. He's told, watch out. He asks once they say, OK, am I right in all that descriptive? And why would you then not use your personal vacation time if it's just these two or three isolated medical emergencies? OK, yeah, I think there's a lot in there if I can. I mean, unpack that just briefly. Yes, it is. It is correct that he had exhausted his FMLA leave, but when he was off work for the 90 days in 2015, April 20th through July 20th. So that's true. And it's also true that he was informed by BNSF that he would be eligible for FMLA again in April of 2016. That moved at various times in the record, but I think that's where it landed. It's also clear that Mr. Pechtel fast tracked his discipline in order to terminate him before he would get that FMLA again. But to your point, I think which is, was there other leave that he could have used? And yes, there is one incident of that where Mr. Weber was informed by a, I don't want to say dispatcher, but a scheduler that that he had a vacation time that he could use. And our point or position on that is there is a difference between paid leave and unpaid leave and vacation, which is a collectively bargained right to a certain number of times. And presumably vacation serves the purpose of regenerating and not necessarily to see a doctor. Now, I think in retrospect, I think even Mr. Weber would agree that that would have been something to reconsider, but it doesn't divert from the point of should the four absences be unpaid and protected leave for a medical condition and a disability. That's a good answer. I guess just thinking sort of atmospherically, it may seem harsh, but he was told they were going to have to be harsh. So you're, you still think intermittent medical leave is a legal, reasonable accommodation for an employee. What's the, what is the limiting principle when you said yourself a minute ago, well, it couldn't be abused. How do, how would a, what circuit has defined the legal rule you're proposing? Well, I don't, in terms of a specified period of time that goes to the undue hardship and courts with respect to continuous leave are all over the board, depending upon the size of employer and other circumstances. Right. But with respect to intermittent leave, I'm not aware of any court that's established any type of a bright line, nor do I think that one could be set because for a smaller employer, their answer might be, we can't do it at all for a small intermittent leave case that you've, you've got, I mean, you may have put in your brief, just tell me which one you would point to as one that we should adopt. Oh, sure. Well, in the fifth circuit, the Carmona case is the one that I'm familiar with. It principle of intermittent leave and how it can interact. Like, but there, you know, I'm going to interrupt you because, because in Carmona, it was seemed built around Southwest saying, you know, this is fine. We've got a lot of replacements, but the record's pretty clear. He got told we've been leaning at too long. Now we've got, now you've got to show up. So that seems very distinguishable. Oh, I would agree with your honor, except only the leaves that start in 2015 are related to a seizure. And he continued to have any number of absences. I would agree with your honor completely, but when it comes to an accommodation in the form of an intermittent leave, and the fact that BNSF has an extra board, which was the sole purpose is to cover those absences for vacations and disability or in whatever FMLA. I mean, they have, you know, any 24 seven operation has got to have the accommodation you're seeking. I apologize, your honor. What is the accommodation you're seeking with respect to the 2016 events? It is intermittent leave for varied for, for two doctors visits a year and a reasonable amount of absences for these triggering events. And I would be the first to agree that if Mr. Weber's absences, because of a lack of sleep or not feeling well enough to work exceeded some reasonable amount, then discipline would be appropriate. I mean, one benchmark for a large employer like BNSF is the FMLA. I mean, that requires 12 weeks, potentially of intermittent leave. You'd have to show another position or something like that. Well, not defined leave as an accommodation. And you haven't presented any evidence of another position that the employer should have made available. Your honor, if I understand you correctly, maybe we're talking about the 2015 event where Mr Weber requested to be transferred to another position, the A. C. D. Or assistant chief dispatcher position. And if that's the case, the testimony from Mr Weber is that he asked Sterling Barker about that position because Mr Weber was aware that pregnant dispatchers and some other people with medical conditions had been allowed to work in those A. C. D. Positions for a short period of time because they're in the same craft. Now, in the railroad industry, transfer to other positions can be tricky if you have to give up your seniority and that kind of thing. But with this assistant chief dispatcher position, that's not the case. And that's all regarding regarding that A. C. D. Position. Is there anything in the record? Can you point me to the record evidence that shows that Weber was qualified for the A. C. D. Position? Well, you know, your honor, the A. C. D. Position. I know Mr Weber worked there a long time. I think the best I can do to point in the record is where he had conversations with Mr Barker, Mr Ruby and Mr Wyatt about those positions. And there was never a response from BNSF. Hey, you're not without looking into it. And Mr Ruby and Mr Wyatt had said that that surprised them as well, that there weren't some available. So to be candid, I'm not aware of any discussion between Mr Weber and the railroad about, hey, give me a job description. Can you do it? Can you not do it? It was always about whether, you know, there was an opening. Okay, well, that's my second question is, is there anything sort of in the record that definitively kind of shows whether an A. C. D. Position was vacant when Weber requested reassignment in 2015? There is not anything in the form of like a job posting. And what makes this situation different than other transfer reassignment cases is sometimes employers or human resource can go online and say, here's a position I found that's vacant and I want to apply for and permanently transfer there. What's different here is that this was a short term accommodation, almost like in the workers comp setting, which this is not. They might have somebody count bolts or do some paperwork until they heal from a surgery or something. It's more of a short term position. So to answer your question, Your Honor, there's definitely nothing I've seen in the record as to a job posting or vacancy. What we have is a record 919 through 920 and 943 through 946, a discussion of whether those responses surprised them that Mr. Barker wasn't willing to put him into that A. C. D. Position for the 90 days. So that's what's correct. Final question. This one's really about the appropriate statute of limitations. So can you clarify for me the appropriate limitation statute for a reassignment claim under the Rehab Act? I know you have this argument that the from our circuit that support that argument, not with respect to the Rehabilitation Act. I imagine there are some cases that apply the four year residual statute of limitations. This is a bit of a nuance and perhaps I'm guilty of my legislative history background, but the Fowler case in the Third Circuit was one that I argued and had discovered through research that because the Rehab Act did not contain a reassignment element or cause of action before 1990, um, it just didn't exist. And so when the ADA amendments were applied to the Rehab Act, that created a new cause of action, which triggers 29 U. S. C. 1658. Um, so it's a, it's, it's such a nuanced, uh, or I shouldn't say nuance is just such a niche argument because it doesn't come up that often, but I'm not aware of any other, anything in the Fifth Circuit or for that matter, anything outside of, um, only the Third Circuit is the only thing I'm aware of that would apply that statute as opposed to somewhere else. And that's unique to that cause. I mean, I'm not arguing that the four year applies to any other cause of action under the Rehabilitation Act. Okay. Thank you, Mr. Paul. I may reserve five minutes. I did that. Yeah, you have that. Okay. Thank you. Mr. Prude. Good morning, Your Honors. May it please the court. My name is Micah Prude. I'm representing the Appellee in this case, BNSF Railway Company. As Mr. Paul mentioned during his opening presentation, the only issues before the court today are two very, excuse me, Your Honor, are two very narrow failure to accommodate claims. One arising in 2015 when Mr. Weber claims that company violated its obligations when it allowed him to go on a medical leave of absence rather than creating a new position for him, the ACD position. The second claim arose in 2016 when Mr. Weber says that the company violated its obligations when it refused to what we believe should be characterized as going unlimited and unpredictable amounts of absences anytime he subjectively felt like he had not gotten enough sleep the previous evening. Each of those, the reason I point out that these are both failure to accommodate cases as opposed to other types of claims is that a number of the arguments that Mr. Weber certainly has included in his brief and has touched on during his opening presentation relate to differential treatment type issues that are only relevant to discrimination or retaliation claims that he raised before the district court but that are not on appeal to this court. And so those issues, to the extent the court takes a look at them, we don't think they're supported by the record, but we think it's unambiguous that they do not apply to the question of did the company have an obligation to accommodate Mr. Weber and if so, did it fulfill that obligation? Can you answer again what I called before an atmospheric issue because looking at the cases about absenteeism, they're usually pretty egregious, employees staying at home and all that. Am I wrong to sort of see this narrative as unusual? The guy's been with your company for 30 years and no one disputes he has a stroke and we have four medical, two certainly medical, two less, but related to the stroke, all before he's going to begin to get FMLA leave again. Am I wrong to think a little bit of more leniency medically? Um, this is a little unusual to me that they wouldn't accommodate undisputedly true doctor's appointments relating to someone who's having epileptic seizures. Yes, your honor. And I would, I would hesitate to tell your honor that you're wrong, but that I will say that's not the way that we would frame that argument and we don't think that's the way it should be analyzed. So yeah, go ahead. You both are excellent lawyers and I appreciate your tone and just, that's just, it seemed that was an issue there. So I will address that then directly, your honor. The, that relates of course to the 2016 absences when Mr. Weber says that he, he needed these accommodations, which he identified as being able to not come to work anytime his doctor told him he needed a doctor's appointment. And then in addition, anytime he subjectively felt like he had not gotten enough sleep. Now, in retrospect, we know that those absences ended up taking just five days over this relevant three month period, January, February and March of 2016. Of course, there's no way of knowing in advance. BNSF had no way of knowing in advance that it would only take five days. And that wasn't the request that Mr. Weber made. If Mr. Weber had come to BNSF and said, look, I need these five days off, but I've used up all of my available paid leave. I need you to give me some additional unpaid leave. That might on its face be a reasonable accommodation. And as BNSF wanted to then say, well, we're not going to let you have that accommodation. It likely would have an obligation to present some sort of undue hardship analysis or evidence. Uh, that's not what this case is though, because Mr. Weber did not come in and say, I need five days off or two days off or any specific amount of time. The only thing he's identified, and I'll point this out in a moment, he didn't actually request this during his employment. The only thing identified was on appeal is I want an unlimited amount of absences. Mr. Paul has acknowledged that is not, is not reasonable on its face. And the reason it's not reasonable, your honor, is that this court and many others have consistently held that regular and predictable attendance is an essential function of most employees' jobs. And here, there is no question that was an essential function of Mr. Weber's job. Mr. Paul conceded that point in an argument before the district court on a separate claim, an FMLA claim, and that's in the record at 2218, where Mr. Paul said, certainly showing up to work regularly is an question about whether or not showing up to work regularly was an essential function. It was. And so the question is for the 2016 claim, could Mr. Weber perform that essential function? And we believe it's undisputed that he could not. So what he's asking for here, we believe should be analyzed as a request to remove an essential function from his position, which is in other words, let me be gone, be absent whenever I feel like I haven't gotten enough sleep. And that is just on its face, not a reasonable accommodation. And so because Mr. Weber has not identified a reasonable accommodation, we do not then move to the second part of an analysis in terms of whether or not that would have been an undue hardship or an undue burden. Employers get to define the job. The job here was defined to have an essential function of regular attendance. Mr. Weber could not meet that requirement. And so his failure to accommodate claim fails. Now setting aside that issue, I want to point out that there's nothing in the record that shows that Mr. Weber requested this sort of accommodation as he's now framed it and as he argues it to the court. He seems to primarily rely on a note that he says was from his doctor, which he says gave him the ability to be off whenever he didn't have enough sleep the night before. That note is in the record at 681. And when the court looks at that note, what you'll see is that's actually a note from his nurse practitioner. And that note doesn't say anything at all about Mr. Weber needing to be off work regardless of, you know, not enough sleep or any other reason. The only thing it says is that when we have an employee who has seizures, we recommend that the employee get good sleep hygiene because if he doesn't have good sleep hygiene, that can result in an increased risk of seizures. Doesn't say anything at all about him needing to be off work. Doesn't say anything at all about if he doesn't get four hours of sleep or six hours of sleep or anything else. It just says he needs to maintain good sleep hygiene. So that note that he gave to the company late in his employment does not support or even constitute a request for the type of accommodation he's asking here. There's a second problem with that note, which is that the the next day. That's important because the absences for which Mr. Weber was disciplined took place in January, February, and March of 2016. And so Mr. Weber, to the extent that note can be viewed as any sort of a request for an accommodation, it simply came too late. It's a request, if it's a request for anything, for retroactive leniency. And this court and the EEOC have repeatedly said that, in other words, requesting retroactive leniency is not a reasonable accommodation. The most recent case I found on that, Judge Willett, you authored, that was Clark v. Champion, 952 F3rd 570. And you repeated that well-known and non-controversial element of the law, which is that a retroactive, a request for a retroactive exemption from the policy as an accommodation is not an accommodation under the ADA. Now, I suspect Mr. Paul will argue, and perhaps the court might think, well, isn't just telling the company that I'm not going to be there on certain days, is that enough of a request to the company to at least trigger some sort of obligation for the company to then engage in the interactive dialogue? And to that, I would say it is not, at least not in these circumstances. One of the absences, as Mr. Paul acknowledged, was for a colonoscopy, which had nothing to do with this disability. So Mr. Weber doesn't even attempt to argue that he should not have been disciplined for being gone that day. Two of them were for days when Mr. Weber said that he could not come to work. One of those, he came to work and left and said, I'm calling off sick. The other, he just called that morning and said, I'm laying off sick. There was nothing, I believe, in the record that ties those to his disability. Now, the two that related to his doctor's appointments, those certainly were known to the company to be tied to his seizure issues. So let's assume, for whatever reason, that those, you know, those two doctor's appointments, he did enough to start the interactive dialogue process. I'm going to just interrupt there because that was important to me. I didn't, I didn't, I was, I was reading your brief and wondering if you were saying categorically an equivalent of an FMLA request would never be sufficient to trigger the interactive. But I think the position you're describing now is more palatable in that it, you know, something unrelated, colonoscopy, I'm sleepy or whatever, those two. But if you're, you've just said what I thought would be correct, which is if he specifically tied it to his disability, he wouldn't have to be more precise and use talismanic words, correct? That's absolutely correct, your honor. You do not have to use talismanic words. BNSF has not argued that that would be against this court's precedent. And that's not what our argument turns on in whole or in part. At most, whenever an employee does that, the employer then has an obligation to engage in this interactive dialogue. And the purpose of the interactive dialogue is to find out, is there an accommodation that could allow this employee to do his job? The company undisputedly did do that. And each time Mr. Weber would raise this issue, the company would say, if you want to take those days off, here's how you need to do them. You have paid leave that's available to you. You can use those days and they will not be held against you. You could apply for a medical leave of absence. And if that's approved, those days are not held against you. There were other options available to Mr. Weber. He was very senior. He could have exercised his right to move to a different shift or he'd have more time during the day to go see his doctor to ensure he got an adequate amount of sleep. But in response to those offers by the company, Mr. Weber uniformly and intentionally said, I'm not going to do that. I'm going to take these days off. I'm not going to use my paid leave. I'm not going to apply for medical leave. I just I don't want to do it. I think if the doctor says I need to go to an appointment, that's good enough. And the problem with Mr. Weber is that by offering him the use of these paid days, the company was offering him a reasonable accommodation. And Mr. Weber is not entitled to his accommodation of choice, which I guess here would be to save his vacation days. He's just entitled to an accommodation. The score is repeatedly held that you can't just just insist on your own type of accommodation and ignore the attempts by the company to give you alternative accommodations. The Troutman case that we cited, which is 756 Federal Appendix 521, said that specifically, that an employee can't, quote, leave work early and then sue his employer for being unreasonable. But that's what Mr. Weber did here. And that's an additional reason that his 2016 claim ought to be affirmed, the dismissal of it, because the company, in fact, offered him these alternative accommodations and he simply refused to take advantage of them. Of course, the bigger picture is the one that I started with, which is that the accommodation he's identifying here is unreasonable on its face. I will say before I turn to the 2015 claim, briefly, there was this notion that Mr. Weber thought or claims now that these leaves or these absences were somehow approved. That's not supported by the record. When you look at what actually Mr. Weber relies on for that assertion, that's not what it is. He said that these absences would be held against him unless he used certain types of leave. That's why, for example, on page 564 of the record, he said, he wrote a letter to his supervisor shortly before his termination. And he said, the fact that my own stubbornness is resulting in the termination of my job or the elimination of my job really makes me sick. I know that much of this is on me. And that's because there was no confusion at the time that Mr. Weber thought these absences were approved. He's taken them consistently. He knew they wouldn't be. He just thought they ought to be approved because in his view, there was something that his doctor required. And so that point I wanted to point out, Your Honor, that's not supported by the evidence on which they rely. That's not an issue here. Before you go to the 2015, I just had one fact, one legal question about 2016. Factually, when you stayed in the brief, he was the second most out of sort of 600 absent. Did that include union work absences? I believe that did not, Your Honor, because it only involves unapproved absences. That's what that number relates to. The calendar that relates to his absences is, I can tell you where that is in the record, but he had not been a union representative for a long enough period of time for that to matter. And the reason for that is that attendance is viewed on a 12-month rolling period, and he had not been, by the time January of 2016 rolls around, a union representative during that previous year. Okay. Then the quick legal question is, you heard when I tend to ask, what's your best case? And the response predictably, as in the brief, was Carbona. And the question then to you would be not just distinguishing Carbona, but does the sort of fact that you have that extra board sort of put you in the world that Southwest was in? It does not, Your Honor. And so as the court knows, the Carbona case was a very unusual fact pattern. The thing that really turned the dial, so to speak, in Carbona was that there was a very unusual policy that the employer had in that case. That policy said, and I'll quote the court's language there, the policy, quote, that Southwest flight attendants have nearly unlimited discretion in determining when and how often they want to work. So the question in Carbona, the court assumed for purposes of discussion that essential, that one of the essential functions was regular attendance. Then they looked at this policy, as well as a unwritten policy that was even more lenient, and said, we think there's a fact issue as to whether this employee was meeting that essential function. We don't have anything remotely similar here. Mr. Weber concedes that what he was doing was in violation of the policy. This is not a policy that allows people like at the Southwest case unlimited discretion in determining when and how often they want to work. That's the entire reason that Mr. Weber ended up getting in trouble, was that he, that's what he wanted, was to be able to take off whenever he saw fit. But that was not consistent with the company's policy, and that's this case is, we believe, readily distinguishable from Carbona. And the past leniency doesn't change that for a number of reasons, including in the past, Mr. Weber was gone a lot for union business. Now that's, you know, those were excused absences. I think the key difference is that there was a new supervisor who showed up in 2014, Bobby Peckle, and we cited Mr. Peckle's testimony, and there's no dispute. And Mr. Peckle said, essentially, going forward, I'm going to start holding Mr. Weber and these other employees to our policy, and we're going to take it seriously, and, you know, if they have an excused need for leave, like a medical leave of absence, that's certainly fine. That's not going to be held against him, but otherwise, you know, we're going to make him follow the policy. And so, I had asked Mr. Paul about helping clarify for me the appropriate statute of limitations for a reassignment claim under the Rehab Act, and he tackled it in his blue brief, and you tackled it in your red brief. And is there anything else you'd like to add in the way of clarification? I will, Your Honor. The key distinction there is that if this was a claim for failure to reassign, the argument might have some force, but this is not a claim for failure to reassign. It's a claim for failure to accommodate. And everyone, so the issue is, was a failure to accommodate claim available to plaintiffs prior to 1990? It absolutely was. Now, this particular accommodation was not available. Mr. Weber's bringing a claim for failure to accommodate, and the reason I would point out that the position that Mr. Paul and Mr. Weber have taken isn't workable is that it would result in two different sets of statute of limitations for the rehabilitation of that claim, depending on whether or not the employee asked for reassignment or if he asked for some other type of accommodation. So here, for example, everyone agrees that workplace modifications were available before 1990. So presumably, they would concede, well, if he had asked for an accommodation that was a workplace reassignment, he only has a two-year statute of limitations. But here, because he's asked for this different assignment, a reassignment accommodation, we now get the benefit of the four years. You have the exact same claim, which is failure to accommodate, with two different sets of statutes of limitations. We don't think that is a workable standard, and we don't think that's supported by sort of the cases that we've cited for the federal catch-all. I will say, I agree with Mr. Paul, I have not seen any case, and we looked quite a bit from the Fifth Circuit that addresses that issue. So we don't, again, let me just conclude by saying that argument relates to the 2015 Rehabilitation Act claim. We do not think the court needs to reach that claim, because the issue there, it's undisputed that for 90 days, Mr. Weber was unable to perform the essential functions of his main position, and that he asked the company, can I be moved into an ACD position? And it's undisputed that his supervisor said, we have no ACD positions available. And Mr. Weber says, I'm not claiming that that supervisor was lying. And he did not do any discovery or present any evidence during the case below to show that the supervisor was lying. And that's fatal to his 2015 Rehabilitation Act claim, because, as this court has repeatedly held, in order to have a viable claim that you should have been transferred as an accommodation, the employee has an affirmative obligation to come forward with actual evidence of a vacant position for which he was qualified. And to address, as my last point, Judge Willett's question prior about whether he was qualified for the ACD position, I would point the court to pages 710 through 711, where his supervisor said that he did not think Mr. Weber would be qualified during that period, even for his ACD position, because of how frequently he was absent. So, in other words, the same failure to be able to come to work regularly was fatal for that position as well. That's far down the argument path, though, Your Honor. You won't have to get there, we don't believe, because you can just hold. He did not have any evidence of an available position, and that fact alone ends the analysis under this court's well-sounding precedent. I'm out of time. If no one has any further questions, I would thank Your Honors and ask you to affirm the District Court's decision. Thank you. Thank you for your argument, gentlemen. This case is submitted. Your Honor, I apologize. I thought I'd reserve five minutes, Your Honor. I apologize. You're right. I apologize. May I? Go ahead. Okay, I'd just like to begin where Mr. Prude began, by saying that intent is not relevant to the claim, and while that's true, that in a failure to accommodate case, we do not have to prove intent, that doesn't mean that we can't. And Mr. Pechtel is clearly on record as deviating from the normal practice by fast-tracking discipline, which means rather than give a month, checking attendance for a month, and then giving a month to improve, and then checking it again, Mr. Pechtel's on record as wanting to fast-track it, looking at every month, which was for the purpose of terminating him before the FMLA. So it doesn't, we still can show intent, even though we don't have to, and we would, given that opportunity to have a jury trial in this case. The second point is Mr. Prude seemed to argue that a reassignment case is not a failure to accommodate case. I think these days, after the ADA amendments, I think it's fair to say there are three types of accommodations. One, you try to accommodate someone in their current position, they couldn't do that with Mr. Weber because of his seizures and the safety-sensitive nature. The second accommodation you go to is, will a medical leave of absence permit that employee to return to his or her former job? And that is, that was the concept between that first medical leave. And then third, I think as alluded to in one of the briefs, an accommodation of last resort is reassignment. So a reassignment case is not different than an accommodation case. It's one type of an accommodation. The point about there being different statute of limitations, I just don't think is persuasive. There are certain statutes like the FMLA that provides for a two-year statute of limitations, but three years if you prove that it was intentional. So that's really not an unworkable scheme with respect to a different statute of limitation for a different cause of action. To address the reference to Judge Willett's opinion in Clark v. Champion, that of course, those were extreme facts. That involved a gentleman who was sleeping on the job numerous times. And so generally for the proposition that when a work rule is violated and an employee tries to come back and kind of bootstrap it as an accommodation, I agree, that's suspect. And that needs to be looked at on the individual facts about whether that should go to a trial or not. But in this case, with respect to, not with respect to the office visits, because those were foreseeable, with respect to the unforeseeable events when Mr. Weber was following the advice not to work if he felt that he couldn't because of lack of sleep that could trigger a seizure. With respect to those, the railroad has a process where they is charged and presumably the reason to have a hearing is to get to the facts and allow the employee through his union representative to present evidence as Mr. Weber did to say why these two or four absences total were related to his seizures. And indeed they were. And of course, that hearing happens before any discipline is issued, including up to termination. So to say that Mr. Weber or his physicians have to be clairvoyant to determine when there might be an unforeseeable event is just not workable. And it's clearly distinguishable from Judge Willard's opinion in Clark, just extreme facts. So at the end of the analysis, we're talking about four simple days when he was legitimately treating with either his neurologist or the condition related to his neurologist. You just on that point, I mean, to reduce it to four, but opposing counsel has just suggested that the real he never made it that clear that when he was asking it, it was still this stubborn. I want to be able to go whenever I can't sleep. And they're saying it might have been a different story if he just said, I have an exact epileptic doctor appointment. But are you claiming that the requests were very targeted and specific? The request for the doctor's appointments definitely were the request for the triggering events were after the fact, but also clear. And what's important here is it's in the brief. There's no training under the ADA at this company. There are no forms. Mr. Weber did what he can't interrupt because your time's short. But what about the fact that apparently this nurse's note comes after the four incidents? Is that true? That's correct. Because he now knows that he's being charged for what we thought was a legitimate use. So he's trying to back it up with that evidence by saying this is legit. My doctor told me to avoid triggering events. And what he did, the only thing he did know how to do was he advanced through his general chairman to Holly Morgan, the vice president of human resources, where they said, hey, your federal law doesn't trump our collective bargaining agreement. And that's really what this is about, is that BNSF never had any policies in place that support the interactive process to say, or to allow Mr. Weber to come back and say, well, if you think it's unlimited, let me get something from my doctor that says it's not unlimited. That's the heart of the interactive process. And it never happened here. So because BNSF never really processed his request for accommodations, we have no interactive process. We have no showing of any undue hardship, which they could never show in light of either extreme absences or removal of the extra reward. And I know, I know I'm out of time, but for those reasons, we submit that there are certainly jury questions here. We know that the intermittent leave is in any type of accommodation is factually intensive and really request the opportunity to present this to a jury. Thank you very much. Thank you, Mr. Powell. And with that, we've concluded the arguments for today. And for this week, all the cases argued and those that were not argued will be submitted. And this panel will adjourn signing due. Thank you, Your Honor. Thank you, Your Honor. Thank you.